IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| DUSTIN C. WILSON, | ) | Civil Action No. 7:15cv00134 |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| LT. TINCHER, *et al.*, | ) | By: Norman K. Moon |
|     Defendants. | ) | United States District Judge |

Dustin C. Wilson, a Virginia inmate proceeding *pro se*, filed a complaint pursuant to 42 U.S.C. § 1983. Wilson names several staff of the River North Correctional Center ("RNCC") as defendants: Warden Wright, Lieutenant Tincher, Sergeant Lundy, Grievance Counselor Walls (collectively, "correctional defendants"), and Nurse Payne. Wilson argues that defendants violated the Eighth Amendment by using excessive force and being deliberately indifferent to a serious medical need and that they violated the Fourteenth Amendment by not assigning him to protective custody. The correctional defendants filed a motion for summary judgment, Nurse Payne filed a motion to dismiss, and Wilson filed a cross-motion for summary judgment and brief in opposition to the motion to dismiss. Upon consideration of this action, I conclude that Warden Wright, Sgt. Lundy, Grievance Counselor Walls, and Nurse Payne are entitled to summary judgment and that Lt. Tilcher is as well, except for the claim involving Oleoresin Capsicum ("OC") spray.

I.

At approximately 9:45 p.m. on July 31, 2014, Wilson flooded his cell by breaking a sprinkler head and damming the door. Sgt. Lundy responded to the cell first and saw a lot of water inside. Wilson refused Sgt. Lundy's six orders to go to the cell door to be restrained and replied that staff would have to come get him.

After correctional staff received approval from the medical department to use OC spray[1], Sgt. Lundy sprayed it into Wilson's cell at 10:05 p.m., hitting Wilson in the back. Sgt. Lundy again ordered Wilson to cuff-up at the door. Wilson turned toward the door, and Sgt. Lundy then shot another burst of OC spray into the cell. Wilson retreated to the back of the cell, lay in the standing water, covered himself with a wet sheet, and repeatedly washed off the OC spray. Wilson asserts that Sgt. Lundy deployed OC spray for ten to fifteen seconds, but Sgt. Lundy avers that he never sprayed it for more than one full second for either burst.

A RNCC staffer began video recording Wilson, and after Wilson refused Lt. Tincher's order to cuff-up, a cell extraction team entered the cell at approximately 10:15 p.m. Upon entering, Lt. Tincher told the extraction team member holding the shock shield[2] to "light it up," and what could be electrical arcing can be heard in the video as the extraction team wades toward Wilson. However, the arcing stopped before the shield touches Wilson, despite Lt. Tincher's second command to "light it up" while Wilson and the extraction team stood in inches of water in a cell furnished with metal furniture. Notably, no one alleges that Wilson was shocked.

The extraction team easily restrains Wilson, who was calm and compliant. The extraction team brought Wilson to the medical department for decontamination of the OC spray. However, Wilson refused to undergo decontamination of the OC spray if hot water would be used because Wilson believed hot water would re-activate the OC spray. Deeming his objection

---

[1] OC spray is a chemical agent similar to what is commonly known as pepper spray or mace and irritates a person's eyes, throat, and nose. *See, e.g.*, *Park v. Shiflett*, 250 F.3d 843, 849 (4th Cir. 2001) (describing the physiological effects of OC spray).

[2] The "shock shield" is a long, narrow piece of Plexiglas-like material that can discharge an electric current across its center.

as a refusal for decontamination, Lt. Tincher ordered the extraction team to move Wilson into an isolation cell in the medical department.

Once in the medical cell, Lt. Tincher and the extraction team cut off Wilson's clothes and put Wilson in ambulatory restraints. Nurse Payne checked the restraints in accordance with a policy that required the restraints be applied loosely enough to insert a finger between the inmate's skin and the restraint.[3]

Nurse Payne checked the restraints and recommended that the right wrist restraint be loosened, and the officers loosened it. Nurse Payne rechecked all four restraints and noted in the medical report that: her exam did not reveal any injury, trauma, or abuse; Wilson's lungs sounded clear; Wilson denied having shortness of breath or sustained any injury; and Wilson did not complain of chest pain. Nurse Payne further noted that Wilson washed his eyes in the sink without difficulty.

At approximately 2:17 a.m., Nurse Payne wrote in Wilson's medical record that Wilson complained about a leg iron cutting into his leg. Nurse Payne examined the leg and did not see any break in the skin. Nonetheless, Lt. Tincher adjusted the restraint, and Nurse Payne rechecked all four restraints. Nurse Payne noted in the medical record that the restraints were adequate and not too tight and that Wilson was calm and cooperative.

At approximately 8:15 a.m., another nurse assessed Wilson's eyes. The nurse noted that Wilson's eyes were red and puffy and cleaned his eyes with sterile water.

---

[3] The video recording stops once a nurse is called to check the restraints.

The ambulatory restraints were removed without incident at about 2:41 p.m. on August 1, 2014, and Wilson was transferred to Red Onion State Prison ("ROSP") on August 5, 2014.[4] During the interim, Wilson's property was removed from the flooded cell and likely remained in the housing unit's storage room. Per policy, Wilson's property should have been transferred with him to ROSP, but Wilson complains that he never received his property.

## II.

Wilson lists the following claims in the complaint:

1. Lt. Tincher is liable for using excessive force and for the excessive force that occurred in his presence[5];

2. Warden Wright "retaliated" against Wilson by authorizing Wilson's transfer from RNCC's protective custody unit to ROSP's segregation unit, which also constitutes deliberate indifference to the risk an inmate would attack Wilson outside of RNCC's protective custody unit;

3. Sgt. Lundy violated due process by being the last person Wilson saw handling Wilson's personal property before it was lost;

4. Walls failed to "properly assist administrative remedies and depriv[ed] [Wilson] of the remedies"; and

5. Nurse Payne failed to render "proper medical attention" by not "properly checking and correcting" the ambulatory restraints.

Nurse Payne and the correctional defendants argue that they enjoy qualified immunity.[6] The defense of qualified immunity permits "government officials performing discretionary

---

[4] Wilson's medical record indicates that he was in good condition without injury or distress when he arrived at ROSP.

[5] Wilson did not define which uses of force were "excessive." More notable, however, is that neither Wilson nor Lt. Tincher attempt to define which uses of force occurred in Lt. Tincher's presence.

[6] Although the correctional defendants also argue that Wilson failed to exhaust administrative remedies, it is more appropriate to first resolve defendants' claim to qualified immunity. Qualified immunity resolves most of the claims without the need for discovery whereas resolving exhaustion may necessitate additional discovery. *See* 42 U.S.C. § 1997e(c) (permitting a court to resolve claims that, *inter alia*, seek monetary relief from a defendant who is immune without first requiring exhaustion of administrative remedies); *Holland ex rel. Overdorff v.*

4

functions . . . [to be] shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). A court considers two questions to resolve qualified immunity: whether the undisputed facts show that the government official's actions violated the plaintiff's constitutional rights, and whether the right at issue was "clearly established" at the time of the events. *See, e.g.*, *id.* at 236.

After reviewing Wilson's submissions, I conclude that Nurse Payne, Warden Wright, Sgt. Lundy, and Walls are entitled to qualified immunity. Wilson fails to specifically allege their involvement in the violation of a federal right, even after viewing the evidence and inferences in a light most favorable to Wilson.

The more difficult question to resolve, however, is Wilson's amorphous *pro se* claim against Lt. Tincher about excessive force that occurred in Lt. Tincher's presence. It can be reasonably inferred from Wilson's *pro se* complaint and affidavit, and from the correctional defendants' affidavits, that Lt. Tincher was present at the time Sgt. Lundy sprayed OC spray inside Wilson's cell. Wilson contends that the spray was deployed for ten to fifteen seconds, but Lt. Tincher and Sgt. Lundy aver that the spray was activated for no more than one second for each of the two bursts.

---

*Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001) ("The protection of qualified immunity gives officials a right . . . to avoid the burdens of such pretrial matters as discovery.").

After liberally construing the complaint and considering the standards to adjudicate defendants' claim to qualified immunity, I conclude that I must grant in part and deny in part the correctional defendants' motion for summary judgment and deny Wilson's motion for summary judgment. The correctional defendants' motion is denied as to the claim against Lt. Tincher for the use of OC spray that potentially occurred within his presence, and it is granted as to all other claims and defendants.

## III.

Nurse Payne filed a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Legal conclusions in the guise of factual allegations, however, are not entitled to a presumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, alteration, and quotations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level," *id.*, with all the allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor, *Chao v. Rivendell*

6

*Woods, Inc.*, 415 F.3d 342, 346 (4th Cir. 2005). In sum, Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Consequently, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679.

Wilson argues that Nurse Payne was deliberately indifferent to the ambulatory restraints causing pain. During their first interaction, Wilson told Nurse Payne that the restraints were too tight but then told Nurse Payne that the restraints felt "fine" after Nurse Payne checked the restraints and explained that they were correctly applied if she could fit a finger between the restraint and his skin. During their second interaction a couple of hours later, Wilson complained that a restraint was too tight, Lt. Tincher loosened the restraint, and Nurse Payne checked it again per policy. For both encounters, Wilson did not continue to complain of a restraint being too tight after Nurse Payne checked the restraints.

To state a deliberate indifference claim against Nurse Payne, Wilson must allege that she acted with deliberate indifference to a serious medical need. *See, e.g., Estelle v. Gamble*, 429 U.S. 97, 104 (1976). However, Wilson acknowledges that he told Nurse Payne during the first encounter that his restraints were "fine" once they were finally secured, and during the second encounter, Wilson did not complain of a restraint once Lt. Tincher loosened it and Nurse Payne checked it. Additionally, Wilson never complained to Nurse Payne about a need for decontamination or eye pain from the OC spray. Furthermore, Wilson does not allege facts to establish that he suffered from a serious medical need when Nurse Payne examined his restraints. Finally, Wilson's claims of negligence are not cognizable via § 1983. *See, e.g., Estelle*, 429 U.S. at 105-06; *Sosebee v. Murphy*, 797 F.2d 179, 181 (4th Cir. 1986). Accordingly, Wilson fails to

7

describe how Nurse Payne was personally aware of facts indicating a substantial risk of serious harm and actually recognized the existence of such a risk, and he cannot rely on labels and conclusions. Accordingly, Nurse Payne is entitled to qualified immunity, and her motion to dismiss must be granted.

## IV.

The correctional defendants and Wilson filed motions for summary judgment. A party is entitled to summary judgment if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). Material facts are those necessary to establish the elements of a party's cause of action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. *Id.* The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts that demonstrate the existence of a genuine issue of fact for trial. *Id.* at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991); *see Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995) ("Mere unsupported speculation . . . is not enough to defeat a summary judgment motion."). However, summary judgment is not appropriate where the ultimate factual conclusions to be drawn are in dispute. *Overstreet v. Ky. Cent. Life Ins. Co.*, 950 F.2d 931, 937

8

(4th Cir. 1991). A court may not resolve disputed facts, weigh the evidence, or make determinations of credibility. *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995); *Sosebee*, 797 F.2d at 182. Instead, a court accepts as true the evidence of the non-moving party and resolves all internal conflicts and inferences in the non-moving party's favor. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). A plaintiff cannot use a response to a motion for summary judgment to amend or correct a complaint challenged by a defendant's motion for summary judgment. *See Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) (noting that a plaintiff may not amend a complaint through argument in a brief opposing summary judgment).

    A. Lt. Tincher

Wilson argues that Lt. Tincher is liable for using excessive force and for the excessive force that occurred in his presence. Wilson does not specify which uses of force were excessive. After liberally construing the claim and viewing the inference in a light most favorable to Wilson, I consider all types of force allegedly used against Wilson on July 31, 2014, to be included in the claim against Lt. Tincher. I conclude that Lt. Tincher is entitled to qualified immunity and summary judgment as to all claims except about the alleged use of OC spray for ten to fifteen seconds in Lt. Tincher's presence.

The Eighth Amendment prohibits prison officials from inflicting unnecessary and wanton pain and suffering on prisoners. *Whitley v. Albers*, 475 U.S. 312, 320 (1986). To resolve a claim that prison staff's excessive force violated the Eighth Amendment, a court must determine whether the force applied was "in a good faith effort to maintain or restore discipline or

9

maliciously and sadistically for the very purpose of causing harm."[7] *Id.* at 320-21. Whether the force was necessary or intentionally aimed at inflicting unnecessary physical harm depends on factors such as the need for the application of force, the relationship between the need and the amount of force used, the extent of injury inflicted, the extent of the threat to the safety of staff and inmates reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. *Id.* at 321; *see, e.g.*, *Wilkins v. Gaddy*, 559 U.S. 34, 37-39 (2010). A correctional officer may be liable on a theory of bystander liability if the correctional officer: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 204 (4th Cir. 2002); *see Willis v. Oakes*, 493 F. Supp.2d 776, 784 (W.D. Va. 2007) (noting a plaintiff must prove a violation of a constitutional right as a prerequisite to establishing bystander liability).

There was an obvious need for force to restore discipline once Wilson refused to exit his flooded cell despite numerous orders. However, it does not appear that Wilson posed a threat to the safety of staff or inmates.

---

[7] A different Eighth Amendment standard applies to the extent that any of Wilson's excessive force claims involving restraints could be construed as living-condition claims. In order to establish cruel and unusual living conditions, a prisoner must prove that "the deprivation of [a] basic human need was objectively sufficiently serious," and that "subjectively the officials acted with a sufficiently culpable state of mind." *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993) (internal quotation marks omitted). Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement. *See, e.g.*, *Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992). In order to demonstrate such an extreme deprivation, a prisoner must allege "a serious or significant physical or emotional injury resulting from the challenged conditions," *Strickler*, 989 F.2d at 1381, or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions, *Helling v. McKinney*, 509 U.S. 25, 31 (1993). The subjective component of a challenge to conditions of confinement is satisfied by a showing of deliberate indifference by prison officials. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "Deliberate indifference entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835. Instead, it requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. *See id.* at 837; *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

10

Resolving the remaining *Whitley* factors depend on the disputed material facts of how much OC spray was deployed into Wilson's cell. The intensity of the pain and the effort to temper the severity of the OC spray are dependent upon which party's version of facts is true. Ten to fifteen seconds of OC spray could be seen as an amount more than necessary to restore discipline and that would result in the unnecessary infliction of pain and suffering.[8] Viewing the evidence in a light most favorable to Wilson, Lt. Tincher could have been present and stopped the use of OC spray for ten to fifteen seconds, as alleged. Consequently, Wilson has alleged enough to state that Lt. Tincher is liable under the Eighth Amendment for the OC spray and that the right to be free from such alleged excessive force was clearly established as of July 31, 2014. Disputes of material facts preclude awarding Lt. Tincher qualified immunity as to this claim, and accordingly, the motion for summary judgment is denied as to this claim. *See Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008); *Buonocore v. Harris*, 65 F.3d 347, 359 (4th Cir. 1995).

Next, Wilson faults Lt. Tincher for twice ordering an extraction team member to activate the shock shield's electrical current. However, the electrical current was never used on Wilson, and thus, the challenged use of force never occurred. Accordingly, Wilson fails to establish a corresponding violation of the Eighth Amendment.

Wilson also faults Lt. Tincher for not decontaminating him from the OC spray before moving him to the medical department. The video clearly establishes that Wilson was brought to a shower for decontamination, but Wilson replied, "If the water ain't cool, I'm not getting under it." Nonetheless, security staff unlocked the shower stall door, opened it, and stood Wilson in front of the shower stall. Wilson repeated his objection, and consequently, the extraction team

---

[8] Although not determinative, the Virginia Department of Corrections authorizes OC spray to be deployed in half second to one second bursts.

secured Wilson in the isolation cell. While in the cell, Wilson acknowledged that he refused to be decontaminated, and he never complained about not being decontaminated.

Finally, Wilson faults Lt. Tincher for the tightness of the ambulatory restraints. During the first encounter, Wilson said a couple of times that a restraint was "a little tight" while the restraints were being applied. However, Wilson told Nurse Payne in Lt. Tincher's presence that the restraints were "fine" once the restraints were all finally secured. During the second encounter, Lt. Tincher loosened a restraint after Wilson complained that a restraint was too tight. Accordingly, Wilson fails to establish a corresponding violation of the Eighth Amendment.

In conclusion, Wilson does not establish that Lt. Tincher personally used excessive force or that Lt. Tincher was deliberately indifferent to Wilson's desire to be decontaminated or to the restraints inflicting pain. However, there is sufficient evidence in the present record to preclude summary judgment and qualified immunity as to whether Lt. Tincher should be liable for being present when the OC spray was deployed inside Wilson's cell for ten to fifteen seconds.

B. Warden Wright

Wilson argues that Warden Wright "retaliated" against Wilson by authorizing Wilson's transfer from RNCC's protective custody unit to segregation in ROSP, which also allegedly constitutes deliberate indifference to the risk an inmate would attack Wilson outside of RNCC's protective custody unit. Wilson does not provide any evidence in support of these claims. Instead, Wilson bases these claims on his own speculation and conclusions, and he fails to establish that any allegedly retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right. *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Wilson's speculation that he was somehow exposed to a heightened

12

risk of attack while confined in segregation outside of RNCC is not evidence to state a claim or to overcome Warden Wright's motion for summary judgment. *See, e.g., Twombly*, 550 U.S. at 555; *Farmer v. Brennan*, 511 U.S. 825, 837-44 (1994); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Accordingly, Warden Wright is entitled to qualified immunity and summary judgment due to Wilson's conclusory and speculative allegations of retaliation and risk of harm. *See Adams*, 40 F.3d at 74 (noting inmates' claims of retaliation are generally regarded with skepticism because "discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct").

    C. Sgt. Lundy

Wilson argues that Sgt. Lundy violated due process when Wilson's personal property was lost after Sgt. Lundy was the last person Wilson saw handling the property. Allegations that prison officials intentionally or negligently deprived an inmate of his property while acting outside the scope of official policy or custom do not state any constitutional claim if a meaningful post-deprivation remedy is available for the loss. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Parratt v. Taylor*, 451 U.S. 527, 538-39 (1981) (*overruled in irrelevant part by Daniels v. Williams*, 474 U.S. 327, 330-31 (1986)). Wilson possesses a post-deprivation remedy under Virginia law, the Virginia Tort Claims Act. *See* Va. Code § 8.01-195.3. "Section 1983 was intended to protect only federal rights guaranteed by federal law, and not tort claims for which there are adequate remedies under state law." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985). Therefore, Wilson cannot prevail on the claim against Sgt. Lundy about the alleged property loss, and Sgt. Lundy is entitled to qualified immunity and summary judgment.

13

### D. Grievance Counselor Walls

Wilson argues that Walls failed to "properly assist administrative remedies and depriv[ed] [Wilson] of the remedies." Federal law did not require Walls to affirmatively assist Wilson with administrative remedies, and Wilson does not have a constitutional right to access a grievance system. *Adams*, 40 F.3d at 74. Accordingly, Walls is entitled to qualified immunity and summary judgment.

### V.

For the reasons stated, I will grant the correctional defendants' motion for summary judgment as to all claims against Lt. Tincher except as to the OC spray used in his presence and as to all claims against Warden Wright, Sgt. Lundy, and Walls. I will grant Nurse Payne's motion to dismiss and will deny Wilson's motion for summary judgment.

Having resolved the issue of qualified immunity at the earliest possible stage in the litigation, I will direct Lt. Tincher to file a motion for summary judgment within thirty days that addresses the merits of the remaining claim and exhaustion of administrative remedies. *See, e.g.*, *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

**ENTER**: This 18th day of February, 2016.

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

14